Leola Pearl BECKETT, etc., et al.,
Plaintiffs,

v.

SCHOOL BOARD OF THE CITY OF NORFOLK, VIRGINIA, et al.,
Defendants.

Civ. A. No. 2214.

United States District Court
E. D. Virginia,
Norfolk Division.

May 8, 1959.

Victor J. Ashe and J. Hugo Madison, Norfolk, Va., Spottswood W. Robinson, III, Richmond, Va., Oliver W. Hill, Richmond, Va., Joseph A. Jordan, Jr., Norfolk, Va., for plaintiffs.

Leigh D. Williams, W. R. C. Cocke, Leonard H. Davis, City Atty., Norfolk, Va., Albertis S. Harrison, Jr., Atty. Gen. of Va., Walter E. Rogers, Richmond, Va., for defendants.

WALTER HOFFMAN, District Judge.

This case is again before the Court following the opinion of the United States Court of Appeals for the Fourth Circuit filed on October 2, 1958. School Board of City of Norfolk v. Beckett, 4 Cir., 260 F.2d 18. As to the admission of 17 Negro children into previously all-white schools, the action of the School Board in granting the applications and the procedure adopted by the Court was affirmed. As to the 134 Negro applicants denied admission by the Board, the case was remanded for further action as this Court had reserved for further consideration certain questions with respect to the validity of the standards, criteria and

procedures promulgated by the Board and applied to the rejected applicants.

There are, therefore, three remaining questions.

## I

Following the assignment of the 17 Negro children to schools previously attended only by white children, the six schools to which these 17 children were assigned were closed by operation of certain laws previously enacted by the General Assembly of Virginia. Plaintiffs thereupon filed a supplemental complaint alleging the unconstitutionality of such statutes and requesting an injunction to prohibit their enforcement. A district court of three judges as provided by § 2284 of Title 28, U.S.C.A., was designated, process was issued, various motions were filed, and the defendants answered the supplemental complaint.

Since the designation of the three-judge court, the cases of Harrison v. Day, 200 Va. 439, 106 S.E.2d 636, and James v. Almond, D.C., 170 F.Supp. 331, have been decided. The highest court of Virginia held that several of the laws were in violation of the State Constitution. A three-judge court in James v. Almond, supra, ruled that certain statutes were unconstitutional under the Fourteenth Amendment to the Constitution of the United States. The Attorney General of Virginia has stated that a suggestion of "mootness" will be filed with the United States Supreme Court in James v. Almond as the controverted laws have now been repealed. A petition for rehearing has been denied in Harrison v. Day.

The three-judge court designated herein is no longer necessary. Subject to the concurrence of the other members of that court, an order will be entered dissolving the three-judge court to the end that further proceedings will be conducted without regard to the supplemental complaint and the motions and answer in response thereto. The plaintiffs will recover of said defendants their costs incident to the supplemental proceedings.

## II

In this Court's memorandum filed on September 18, 1958, there were eight Negro children (included among the 134 applications remanded to this Court by the Circuit Court of Appeals) whose applications were rejected by the Board due to the pending construction of a new school known as Rosemont Elementary School scheduled for occupancy by September 1, 1959. Reference is also made to the Court's remarks to the School Board under date of August 25, 1958. The rejections were predicated upon the theory of "too frequent transfers" as the evidence suggests that if the Rosemont School is ready for occupancy, these eight Negro children would ordinarily be assigned to Rosemont in September, 1959.

The Court upheld the Board's action in denying these requests for transfer to Norview Elementary School, and nothing further could be added to the comments previously made. The City Attorney of the City of Norfolk has again assured the Court that the Rosemont School will be ready for occupancy as of the first day of the regular school term in September, 1959. The applications of the eight Negro children will remain pending without the necessity of further action by said plaintiffs, unless said plaintiffs file a supplemental request for assignment elsewhere, and if the Rosemont School is not ready for occupancy on the assured date, the Board shall comply with its duty to assign said children to Norview Elementary School in the absence of any good cause indicating that other action should be taken; said good cause to the contrary to be reported to the Court prior to August 15, 1959. If the Rosemont School is ready for occupancy, the Board may make such appropriate assignment as it deems best in compliance with the law.

## III

The third and final question concerns the validity of the standards, criteria and procedures promulgated by the Board pursuant to a resolution adopted July 17, 1958. The resolution was amended on

September 5, 1958, and counsel agree that the decision of this Court will be under the assumption that the amended resolution was in effect.

Of the remaining 126 applicants, approximately 63 failed or refused to take the scholastic achievement test, or otherwise failed or refused to submit to personal interviews, in accordance with the procedures adopted by the Board. Approximately 34 applicants failed or refused to file written objections to the action of the Board, as required by the Court's order fixing a deadline for objections to be filed. One applicant was rejected for geographical reasons, he being already assigned to a school nearer to his home than the school to which he was seeking a transfer. The remaining 28 applicants were rejected as their scholastic achievements and abilities did not justify the transfers and enrollments sought.

While there are some differences of opinion as to the scholastic achievement necessary to consider the appropriateness of a transfer or initial enrollment, the action of the Board on this point is not the subject of attack. All concede that it is proper to subject children to reasonable achievement tests before authorizing a transfer. Implicit in the testimony of plaintiffs' expert educator is the thought that, for the time being at least, reasonable tests and standards must be established during the transition period. Such action is for the benefit of both races as well as the children. This is not to say that the attendance of Negro children in schools attended predominantly by children of the opposite race should forever be confined to such Negro children who have superior intelligence. As stated by the Supreme Court in Brown v. Board of Education of Topeka, Kan., 349 U.S. 294, 75 S.Ct. 753, 756, 99 L.Ed. 1083, "additional time [may be] necessary to carry out the ruling in an effective manner".

Before proceeding to a consideration of the constitutionality of the standards, criteria and procedures adopted by the Board, it should be noted that, following a closure period from September through January, the six affected schools of Norfolk were reopened on February 2, 1959, with the 17 Negro children in attendance. To the everlasting credit of the School Board, the teachers, the children of both races, and the administrative authorities of the City of Norfolk and State of Virginia, it can truthfully be said that there has been no violence and administrative problems have been at a minimum. The attitude of the Board, following receipt of the Court's remarks of August 25, 1958, has been one of cooperation with a sincere effort to comply with the law and, at the same time, to maintain public education so essential to this community. The personnel of the Board may be changed in the future, but this Court will have no difficulty in ascertaining when there exists a deliberate scheme to violate the law in problems confronting the Board and the Court under the Brown decision. We must, however, deal with the present and not the future.

The plaintiffs contend that the standards, criteria and procedures as amended by the resolution of September 5, 1958, are *unconstitutional on their face* for the reason that the tests and interviews are, and will be, required in all "unusual circumstances", and that a Negro child applying for admission into a school attended solely by white children or into any school wherein the races are or will be mixed constitutes an "unusual circumstance". Counsel concede that if the tests and interviews are required of all children seeking initial enrollment or transfer into a school without regard to "unusual circumstances", the procedure would be *constitutional on its face*.

Undoubtedly these standards, criteria and procedures may be *unconstitutionally applied,* but the intent of this ruling is to limit the same within the narrow scope of its constitutionality without regard to its application. The application of such standards, criteria and procedures will remain essentially with the Board, subject to scrutiny by the Court upon request of the aggrieved child. Much will

depend upon the Board itself—a cooperative Board has no reason to doubt the action of any court—a Board which is adamant and refuses to recognize the Brown decision will have continuous troubles.

The United States Supreme Court has never suggested that mass mixing of races is required in the public schools. The underlying ruling is that no child shall be denied admission to a public school on the sole basis of race or color. Indeed, the Supreme Court recognized that a variety of local problems would arise when it said:

"Full implementation of these constitutional principles may require solution of varied local school problems. School authorities have the primary responsibility for elucidating, assessing, and solving these problems; courts will have to consider whether the action of school authorities constitutes good faith implementation of the governing constitutional principles. Because of their proximity to local conditions and the possible need for further hearings, the courts which originally heard these cases can best perform this judicial appraisal.

" * * * Traditionally, equity has been characterized by a practical flexibility in shaping its remedies and by a facility for adjusting and reconciling public and private needs. These cases call for the exercise of these traditional attributes of equity power. At stake is the personal interest of the plaintiffs in admission to public schools as soon as practicable on a nondiscriminatory basis. To effectuate this interest may call for elimination of a variety of obstacles in making the transition to school systems operated in accordance with the constitutional principles set forth in our May 17, 1954, decision [Brown v. Board of Education of Topeka, Kan., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873]. Courts of equity may properly take into account the public interest in the elimination of such obstacles in a sys-

tematic and effective manner. * * *

" * * * To that end, the courts may consider problems related to administration, arising from the physical condition of the school plant, the school transportation system, personnel, revision of school districts and attendance areas into compact units to achieve a system of determining admission to the public schools on a nonracial basis, and revision of local laws and regulations which may be necessary in solving the foregoing problems. They will also consider the adequacy of any plans the defendants may propose to meet these problems and to effectuate a transition to a racially nondiscriminatory school system."

By reason of the Virginia school-closing laws, now declared unconstitutional and recently repealed, the Board has been powerless to submit any plan to meet the problems created by the Brown decision. Whatever the label may be, the resolution of July 17, 1958, as amended, is nothing more than a plan. It is submitted to the Court without the force of law—it is the Board's view that this plan will, for the time being, constitute an orderly transition to a racially nondiscriminatory school system. It is subject to change in the future and the case remains within the jurisdiction of the Court. If it becomes apparent that the Board is repeatedly applying the standards, criteria, and procedures in an unconstitutional manner for the purpose of preventing an orderly transition, the Court may permit the plaintiffs and subsequent applicants to disregard these requirements.

The Board has, for many years, required tests and interviews in "unusual circumstances". They have been required of children of all races and colors and will continue to be so required. The only reason the Board now desires to adopt written procedures limiting the tests and interviews to "unusual circumstances" is to avoid the expense and trouble of testing children seeking routine transfers or initial enrollment where there are no

complications as to scholastic ability, geographical areas, etc. The Board's counsel candidly states that, as to all applications giving rise to the mixing of races in public schools, the circumstances will be deemed "unusual" for an indefinite period of time. It is assumed that, with respect to the schools already racially mixed, the "unusual circumstance" would exist, and that applicants (both white and Negro) applying for transfer to, or initial enrollment in, such racially mixed school will be required to submit to tests and interviews.

■■ It cannot be successfully contended that the standards, criteria and procedures are *unconstitutional on their face*. The case of Shuttlesworth v. Birmingham Board of Education, D.C., 162 F.Supp. 372, affirmed on limited grounds, 358 U.S. 101, 79 S.Ct. 221, 3 L.Ed.2d 145, is authority for the proposition that the Board here may impose standards and criteria which may be vague and indefinite. Merely because all applicants for admission to schools which will result in the mixing of races will be, for the time being, classified as resulting in an "unusual circumstance" affords no basis for saying that the applicant is being denied a constitutional right. We are here dealing not with the individual right, but with the resulting condition brought about by the granting of that right. The constitutional right lies in the denial of admission because of race—not in the prerequisites leading up to such denial. Again, however, the procedures adopted must be reasonable and not so burdensome as to be tantamount to a denial of the constitutional right. In the instant proceeding that question is not before the Court; the sole contention being that both white and Negro children seeking admission or transfer into schools wherein the races will be mixed constitutes an unconstitutional act in that it is discriminatory on its face.

Certainly since August, 1958, and during 1959, it cannot be said that the action of the Board is the equivalent of an evasive scheme to perpetuate segregation. Proof of this statement lies in the fact that 17 Negro children were admitted under the standards, criteria and procedure so established.

It is presumed that the standards, criteria and procedures will be administered fairly by a competent School Board upon whom the primary responsibility rests. The end result of this holding is merely to say that to classify schools attended by children of both races as an "unusual circumstance" is not on its face an unconstitutional act. If the standards, criteria and procedures should be applied in such a manner as to deprive an applicant of his constitutional right to attend the school of his choice without regard to race, all other factors being such as to entitle him to enter such school, the Court's duty would then be plain and the standards, criteria and procedures would be declared unconstitutional in their application. Likewise, the standards, criteria and procedures must be equally applied to all applicants seeking enrollment in or transfer to a school already attended by children of both races, but, as noted, this falls within the category of the *application* of the procedures promulgated by the Board.

This conclusion is not reached without consideration of the recent decision of Hamm v. County School Board of Arlington County, 4 Cir., 264 F.2d 945, 946, in which the court remanded for further proceedings the cases of 26 Negro children whose applications for admission were rejected by the Board with this action being approved by the district judge. A portion of the opinion is as follows:

> "We find evidence in the record that their applications for transfer were subject to tests that were not applied to the applications of white students asking transfers."

It will be noted that the court does not specifically state that *such action is discriminatory per se*. It is not said that the requirement of tests and interviews pursuant to a plan or resolution is unconstitutional on its face. It does suggest, however, that there should be equality of treatment as to children seeking admissions to particular schools under particular conditions. The Arlington

case was referred back to the trial court for more appropriate consideration prior to the opening of the 1959–60 school year.

It is true that, in the instant case, no white children were applicants for admission to a school previously attended only by Negro children. Thus, under the plan presented it became unnecessary to subject any white children to tests or interviews as the "condition" was not an "unusual circumstance". Moreover, the Negro children did not file individual applications for admission to specific schools until after the close of the normal school year in June, 1958. It would have been an impossible task to require tests and interviews of all children once the school closed for the summer season. However, as noted, the Board's standards, criteria and procedures were promulgated to meet a "condition" and not to unduly restrict an individual right.

Holding that the action of the Board in denying the applications of 134 Negro children for admission to certain public schools previously attended only by white children was not arbitrary, capricious or illegal, that the standards, criteria and procedures are not unconstitutional *on their face,* the Board's determination is

Approved.